UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPINE AND NEUROSURGEY INSTITUTE,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF LETTER CARRIERS HEALTH BENEFIT PLAN, et al.,<br><br>Defendants. | Case No. 20-cv-08511-VC<br><br>**ORDER DENYING MOTION TO REMAND**<br><br>Re: Dkt. No. 14 |

This remand motion presents three fairly complicated questions relating to the federal officer removal statute, 28 U.S.C. § 1442(a). This ruling answers those questions as follows:

- A private carrier and any of its subcontractors hired by the Office of Personnel Management to help administer a health benefits plan for federal employees is typically "acting under" the authority of that federal agency within the meaning of the federal officer removal statute.

- Under Ninth Circuit precedent that is analytically flawed and potentially erroneous, when a private health provider sues the carrier and/or its subcontractors under state law for failure to live up to a promise to reimburse the provider for care provided to a covered federal employee, there is typically no colorable federal preemption defense.

- However, when a private health provider brings this type of lawsuit against a carrier and/or its subcontractors, the carrier and its subcontractors typically have a colorable sovereign immunity defense.

In this case, because the carrier and its subcontractor were acting under the authority of the

Office of Personnel Management when they took the actions that form the basis of the private

health provider's claims here, and because they have a colorable sovereign immunity defense, they properly removed the case to federal court, and the motion to remand is denied.

**I**

The federal government maintains health benefit plans for its employees. These plans are governed by the Federal Employees Health Benefits Act (FEHBA). This statute places responsibility for administering employee health plans within a federal agency called the Office of Personnel Management (OPM). As authorized by FEHBA, OPM contracts with private entities called "carriers" to manage the day-to-day administration of FEHBA plans. *See* 5 U.S.C. § 8902(a).

The National Association of Letter Carriers Health Benefit Plan (NALC Health) is one of the carriers OPM contracts with to assist in administering health benefits to federal employees. NALC Health is a division of the National Association of Letter Carriers (NALC), a labor organization representing letter carriers employed by the United States Postal Service. As a division of NALC, NALC Health does not have its own tax identification number or its own funds, but it does have its own director (who is an elected NALC officer) and its own offices and employees. NALC Health's main function as part of the broader NALC organization appears to be to contract with OPM to administer the FEHBA benefits plan to NALC members. But the benefits offered in this FEHBA plan are not merely available to NALC members—other federal government employees may also enroll.

The contract between OPM and NALC Health specifies how NALC Health, as a federal contractor, must manage the FEHBA plan it helps administer. For example, OPM dictates which benefits NALC Health must provide. OPM also sets minimum quality standards governing the speed with which NALC Health must respond to a member inquiry or adjudicate a claim for benefits. The agency obligates NALC Health to do things like maintain a member services department that employees can access by telephone, satisfy certain accreditation standards,

assess the quality of healthcare provided to enrollees, implement a disaster recovery plan, and monitor, protect, and secure sensitive information. Aside from the contract between OPM and NALC Health, OPM also issues regulations, benefit administration letters, and carrier letters that set forth the agency's directives and guidance on how carriers like NALC Health must administer the FEHBA plans.

Because of this arrangement, the finances of NALC Health's benefit plan are organized differently from traditional health benefit plans offered by employers that contract with private insurance companies. For traditional health benefit plans, the insurance company generally pays for employee health care using its own finances, and the employer just pays monthly premiums to the insurance company. The employer thus does not control the accounts from which health benefit payments are made. In the context of the NALC Health benefit plan, the opposite is true—the federal government (as the employer) pays for health benefits from its own accounts. Specifically, the government deposits premiums into a special account in the United States Treasury called the "letter of credit" account, and OPM owns these premiums and controls the reserves. When NALC Health needs to pay for benefits-related expenses, it draws against its letter of credit account. NALC Health's contract with OPM authorizes it to charge this account for certain costs and expenses. These include "benefit costs," defined as "payments made and liabilities incurred for covered health care services." They also include "administrative expenses," defined as "all actual, allowable, allocable and reasonable expenses incurred in the adjudication of subscriber benefit claims or incurred in the Carrier's overall operation of the business." "Legal expenses incurred in the litigation of benefit payments" are listed as one type of "administrative expense." When NALC Health needs to pay for costs or expenses not chargeable to the federal treasury through its letter of credit account, it relies on funds controlled by NALC.

As authorized by its contract with OPM, NALC Health in turn contracts with a private entity—Cigna Health & Life Insurance Company—to help administer the FEHBA benefits plan. Cigna gives NALC Health access to Cigna's network of health care providers. Cigna also

performs administrative services such as repricing claims according to Cigna's agreements with these providers, and determining whether treatments are medically necessary. Cigna does not actually process any health benefit claims itself, as the contract expressly reserves all questions relating to eligibility for coverage and benefits to NALC Health.

**II**

This case arises from a surgery performed at the California Spine and Neurosurgery Institute (California Spine) on a federal employee (identified only as "J.R.") who was enrolled in the FEHBA plan administered by NALC Health.

As alleged in the complaint, California Spine is not part of Cigna's provider network, meaning that it has not contracted with Cigna to set reimbursement rates for the services it provides. Thus, before performing the surgery, California Spine contacted Cigna to ask about J.R.'s health insurance coverage. According to the complaint, a Cigna representative told California Spine "that reimbursement for such services would be made pursuant to 'usual and customary' rates." "Usual and customary" is a term of art in the medical industry referring to the ordinary market rates charged in a particular geographic area for similar medical services provided under similar circumstances by providers with comparable training and experience. The complaint alleges that, after the call, Cigna sent a letter to California Spine "approving [California Spine's] performance of back surgery on J.R., including service code 63030, as eligible for coverage." A surgeon at California Spine performed three surgical procedures on J.R., and then "billed Defendants for these services using Current Procedural Terminology ('CPT') codes 63030 and 69990, respectively, using his standard rates for such services." California Spine's "charges for the surgery totaled $37,000," which, the complaint alleges, "reflected the reasonable and customary value of the services at issue." Neither Cigna nor NALC Health "challenged the medical necessity of any of the services provided to J.R., or otherwise reversed the earlier approval of coverage." But NALC Health "contended that the 'allowed amount' for all the services provided . . . was only $6,907.00, of which $2,072.10 was owed by J.R. as coinsurance." NALC Health and Cigna paid California Spine a total of $4,834.90 for the

surgical procedures performed.

California Spine filed suit in California state court against both NALC Health and Cigna bringing claims of promissory estoppel and quantum meruit. California Spine alleges that NALC Health and Cigna owe the remainder of the $37,000 based on the Cigna representative's promise to pay for services at the "usual and customary" rate. NALC Health and Cigna removed the case to federal court under the federal officer removal statute, 28 U.S.C. § 1442(a), and California Spine moved to remand on the ground that this statute does not apply.

**III**

Under the federal officer removal statute, when someone acting under the authority of a federal officer or agency is sued in state court, they can typically remove the case to federal court. Specifically, the statute provides: "A civil action . . . that is commenced in a State court and that is against . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office" "may be removed by them to the district court of the United States for the district and division embracing the place" where the state action is pending. 28 U.S.C. § 1442(a). To invoke removal under the statute, a defendant must show that (1) they are a "person" within the meaning of the statute, (2) there is a causal nexus between the plaintiff's claims and the actions the defendant took pursuant to a federal officer's or agency's direction, and (3) the defendant has a colorable federal defense. *See Goncalves By & Through Goncalves v. Rady Children's Hospital San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017). The statute must be interpreted broadly in favor of removal. *See id.*

NALC Health and Cigna are clearly "people" within the meaning of the statute, and California Spine does not argue otherwise. *See id.* California Spine does argue that the lawsuit does not relate to actions taken under federal authority, and that the defendants do not have a colorable federal defense.

**A. "Acting Under" Federal Authority**

California Spine's claims against NALC Health and Cigna—based on a Cigna

representative's statements regarding coverage of a person enrolled in a FEHBA plan and the subsequent refusal to pay for services provided to that person—arise from actions taken while NALC Health and Cigna were acting under a federal agency. To be "acting under" a federal agency, an entity must be assisting with or helping to carry out federal duties; "simply *complying* with the law" or being the subject of a detailed regulatory and monitoring scheme is insufficient. *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152-53 (2007) (emphasis in original). A relationship where a private entity "acts under" a federal agency "typically involves subjection, guidance, or control." *Id.* at 151 (quotations omitted). A private entity acts under federal authority when it contracts with the government to help "produce an item" that the government needs, "helps officers fulfill [] basic governmental tasks," or "perform[s] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153-54.

The complaint alleges that Cigna's representative acted as NALC Health's "agent" when speaking to California Spine about J.R.'s coverage under the FEHBA plan. To determine whether the representative's statements—and Cigna and NALC Health's subsequent decision to pay less than California Spine billed—occurred while "acting under" a federal agency, it is thus crucial to understand the relationship between OPM (the relevant federal agency) and NALC Health. *See Goncalves*, 865 F.3d at 1245. "FEHBA assigns to OPM responsibility for negotiating and regulating health-benefits plans for federal employees." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 683 (2006). FEHBA also authorizes OPM to contract with private carriers, like NALC Health, to help administer these plans. *See id.* at 684; 5 U.S.C. § 8902(a). These contracts must "contain a detailed statement of benefits offered." *Empire Healthchoice*, 547 U.S. at 684 (quoting 5 U.S.C. § 8902(d)). The contracts must also "include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." *Id.* (quoting 5 U.S.C. § 8902(d)) (alteration in original). FEHBA thus ensures that "OPM has direct and extensive control over these benefits contracts." *Goncalves*, 865 F.3d at 1246 (quoting *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224, 1233 (8th Cir. 2012)). And

OPM remains “responsible for the overall administration of the program while sharing the day-to-day operating responsibility with the . . . insurance carriers.” *Id.* (quoting *Houston Community Hospital v. Blue Cross & Blue Shield of Texas, Inc.*, 481 F.3d 265, 271 (5th Cir. 2007)). OPM’s oversight over the administration of FEHBA plans is reflected in the financial arrangement between OPM and the carriers: OPM is the one that owns the funds used to pay for benefits disbursed under FEHBA plans, as well as to pay costs accrued in the administration of the plans. Carriers such as NALC Health must draw upon a federal treasury account to pay for plan-related expenses.

Because of this arrangement, a private carrier under contract with OPM “is not acting as an insurer so much as it is acting as a claims processor, serving as the government’s agent while the government takes the place of the typical health insurer.” *Id.* “The private carrier’s only role in this scheme is to administer the health benefits plan for the federal agency in exchange for a fixed service charge.” *Id.* (quoting *Empire Healthchoice*, 547 U.S. at 703 (Breyer, J., dissenting)).

The Ninth Circuit has accordingly held that private carriers “act under” federal authority when they pursue subrogation claims against individuals enrolled in FEHBA plans. *Id.* at 1249. To be sure, this holding was based in part on the nature of subrogation claims specifically and the importance of subrogation recoveries within the FEHBA program. *See id.* at 1246-47. But the holding was also premised on the more general nature of the OPM-carrier relationship, including OPM’s “oversight and directives” over the carriers and the “role” these carriers play within “FEHBA’s comprehensive federal program.” *Id.* at 1249; *see Jacks*, 701 F.3d at 1232-35; *see also St. Charles Surgical Hospital, LLC v. Louisiana Health Service & Indemnity Co.*, 935 F.3d 352, 356 (5th Cir. 2019).

These same considerations lead to the conclusion that NALC Health and Cigna acted under federal authority when taking the actions that form the basis of California Spine’s claims here. Generally speaking, when OPM contracts with a private company such as NALC Health to administer the federal government’s self-funded benefits plan, any specific thing that the private

entity does in the administration of the plan involves “acting under” OPM. So when a Cigna representative, acting as NALC Health’s “agent,” responds to a provider’s inquiries about coverage for a patient enrolled in the FEHBA plan administered by NALC Health, and informs the provider that it will pay a certain amount for services given to that patient, the representative is also acting under OPM’s authority. And when Cigna and NALC Health refuse to pay what the provider bills because the FEHBA plan’s “allowed amount” is less than what is claimed, they are “acting under” OPM’s authority. The fact that California Spine brought claims of promissory estoppel and quantum meruit instead of claims directly under the FEHBA statute does not change this conclusion—the claims still stem from actions taken by NALC Health and Cigna in the course of administering health benefits and determining health coverage under a FEHBA plan. *See Vrijesh S. Tantuwaya MD, Inc. v. Anthem Blue Cross Life & Health Insurance Co.*, 169 F. Supp. 3d 1058, 1064-66 (S.D. Cal. 2016); *Malibu v. Anthem Blue Cross Life*, 2016 WL 5746337, at *5 (C.D. Cal. Sept. 30, 2016). *But see LifeBrite Hospital Group of Stokes, LLC v. Blue Cross & Blue Shield of North Carolina*, 2020 WL 1516337, at *14-15 (M.D.N.C. Mar. 30, 2020).

Of course, not *every* action that a private carrier takes while administering a FEHBA plan on OPM’s behalf would qualify as an action taken “under” the agency’s authority. For example, if the carrier discriminates against its employees who work to administer the plan, the discriminatory acts would not be “under” federal authority just because the carrier happens to contract with OPM. *Cf. Goncalves*, 865 F.3d at 1248-49. Moreover, it would be a very different situation if the carrier were acting as a traditional health insurance company in its relationship with the federal government. In that case, the federal government (with contributions from its employees) would simply be making payments to the carrier for the carrier to pay for federal employees’ benefits. The federal government would be more akin to a customer of the private carrier, and the actions the carrier took in providing or denying coverage would likely not be understood as actions taken under federal authority.

But here, OPM contracted with NALC Health to administer a self-funded FEHBA health

benefits plan, retaining control over the nature of the coverage offered in that plan, as well as over the funds used to pay for benefits provided under the plan. NALC Health further contracted with Cigna to help with this administration. Both NALC Health and Cigna were thus serving as agents of the federal government in administering the plan. Cigna's representations to a health care provider about the scope of the FEHBA plan's coverage and the amount the provider would receive for its services were made while Cigna was "acting under" OPM's authority.

**B. Colorable Federal Defense**

NALC Health and Cigna assert that they have two colorable federal defenses, either of which would entitle them to removal under the federal officer removal statute. First, they say they have a colorable defense of preemption against California Spine's claim for quantum meruit based on FEHBA's express preemption provision. *See* 5 U.S.C. § 8902(m)(1). Second, they say they have a colorable defense of sovereign immunity against both the quantum meruit claim and the promissory estoppel claim. At this stage, they need not prove that either defense will ultimately prevail; they must simply show by a preponderance of evidence that one defense is colorable. *See Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014).

**1. Preemption**

On a blank slate, the Court would perhaps find that the defendants have a colorable preemption defense against California Spine's quantum meruit claim based on FEHBA's express preemption provision. But the Court is not writing on a blank slate—it is bound by the Ninth Circuit's decision in *Cedars-Sinai Medical Center v. National League of Postmasters of the United States*, 497 F.3d 972 (9th Cir. 2007). As discussed below, there are numerous problems with the FEHBA preemption analysis conducted in *Cedars-Sinai* (some of which are repeated across FEHBA case law more generally). But the holding of *Cedars-Sinai* squarely governs the outcome here, and compels the conclusion that NALC Health and Cigna do not have a colorable preemption defense against California Spine's quantum meruit claim.

In *Cedars-Sinai*, just as in this case, a hospital brought state law claims against a carrier that had contracted with OPM to administer a FEHBA benefit plan. *See* 497 F.3d at 974. The

hospital contacted the carrier to verify coverage for a patient enrolled in the plan and to receive authorization to perform certain services. *See id.* The hospital then sought to recover money for the services it performed based on the representations made by the carrier. *See id.* The Ninth Circuit held that FEHBA did not preempt the hospital's claims because the claims were based on a "contractual obligation" between the hospital and the carrier that arose when the carrier told the hospital that the patient was covered by the plan. *Id.* at 977. According to the Ninth Circuit, this distinguished the hospital's claims for reimbursement (which were not preempted by FEHBA's express preemption provision) from claims for reimbursement brought by someone who was enrolled in the FEHBA plan themselves (which would be preempted under that provision). *See id.* There is no material distinction between *Cedars-Sinai* and this case.[1]

As noted, the FEHBA preemption analysis in *Cedars-Sinai* suffers from various analytical flaws, many of which are repeated across Ninth Circuit FEHBA case law more broadly. So despite the clear outcome that the *Cedars-Sinai* decision dictates in this case, and because of the importance and prevalence of FEHBA reimbursement lawsuits, it is worth highlighting those flaws.

First, the FEHBA preemption analysis in *Cedars-Sinai* proceeds under the assumption that FEHBA's express preemption provision can be interpreted identically to the express

---

[1] California Spine attempts to distinguish *Cedars-Sinai* in two ways, neither of which is convincing. First, California Spine says that in *Cedars-Sinai*, unlike here, there was a written contract between the hospital and the carrier governing the payment of services provided to patients enrolled in the FEHBA plan. Second, California Spine asserts that the hospital in *Cedars-Sinai* did not bring a quantum meruit claim. As to the former argument, the hospital's claims in *Cedars-Sinai* were based both on the written contract *and* on the representations made by the carrier to the hospital when the hospital contacted the carrier to verify coverage and receive authorization for the services. *See* 497 F.3d at 974, 977. Precisely the same sort of representations, allegedly made by a Cigna representative to California Spine, form the basis of California Spine's claims here. As to the second argument, California Spine is wrong. One of the claims brought by the hospital in *Cedars-Sinai* was a California state law claim for "common count for work, labor, and services," which is essentially the same claim under California law as a claim for quantum meruit. *See id.* at 974; Judicial Council of California Civil Jury Instructions No. 371 (2021 ed.).

preemption provision in the Employee Retirement Income Security Act (ERISA). ERISA is a separate statute that governs retirement and health care plans for employees in the private sector. The court in *Cedars-Sinai* expressly relies on cases interpreting ERISA's express preemption provision to analyze FEHBA's express preemption. *See* 497 F.3d at 977 n.2; *see also Marin General Hospital v. Modesto & Empire Traction Co.*, 581 F.3d 941, 950 (9th Cir. 2009) (recognizing that the *Cedars-Sinai* opinion "was based almost entirely on cases decided under ERISA"). This idea that the two provisions can be interpreted identically, and that case law analyzing them can be applied interchangeably, is repeated in other Ninth Circuit cases. *See, e.g.*, *Marin General*, 581 F.3d at 950; *Botsford v. Blue Cross & Blue Shield of Montana, Inc.*, 314 F.3d 390, 393-94 (9th Cir. 2002); *Roach v. Mail Handlers Benefit Plan, CNA*, 298 F.3d 847, 849-850 (9th Cir. 2002). But the two provisions are quite different, and it is not at all clear that cases construing ERISA's provision can be mechanically applied in the FEHBA context, or vice versa.

FEHBA's express preemption provision provides: "The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans." 5 U.S.C. § 8902(m)(1).

ERISA's express preemption provision provides: "[T]he provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a). The statute then creates a significant carve out (commonly called the savings clause), stating that any law "which regulates insurance, banking, or securities" is not preempted. *Id.* § 1144(b)(2)(A).

Thus, in the FEHBA context, a state law is preempted by the "terms" of a "contract" between OPM and a private carrier assisting OPM in the administration of a FEHBA plan. In the ERISA context, by contrast, a state law is preempted by the "provisions" of ERISA itself. Because FEHBA's preemption provision "declares no federal law preemptive, but instead, terms

of an OPM-[carrier] negotiated contract, a more modest reading of the [FEHBA] provision is in order." *Empire Healthchoice,* 547 U.S. at 698. Moreover, for the contract's terms to preempt a state law in the FEHBA context, those terms must "relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits)." 5 U.S.C. § 8902(m)(1). A FEHBA preemption analysis thus requires determining whether the allegedly preemptive portions of the OPM contract actually "relate to . . . coverage or benefits." *See Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190, 1196-97 (2017); *see also Empire Healthchoice*, 547 U.S. at 697-98. There is no such limiting requirement in the ERISA context, as a state law can be preempted by any "provisions" in the ERISA statute, regardless of whether those provisions "relate to . . . coverage or benefits."

The types of state laws that can be preempted in the two contexts are also distinct, and the Supreme Court has differentiated the two preemption provisions on this basis. *See Empire Healthchoice*, 547 U.S. at 698. FEHBA's preemption provision only preempts state laws "which relate[] to health insurance or plans." 5 U.S.C. § 8902(m)(1). As the Supreme Court explains, the provision is targeted toward a subset of state laws specifically related to healthcare coverage, such as those "which specify types of medical care, providers of care, extent of benefits, coverage of family members, age limits for family members, or other matters relating to health benefits or coverage." *Empire Healthchoice*, 547 U.S. at 686 (quoting H.R. Rep. No. 95-282, p.4-5 (1977)). The provision thus imposes as a "precondition[]" to preemption that the state law be health-related. *Coventry Health*, 137 S. Ct. at 1196; *see also Vrijesh*, 169 F. Supp. 3d at 1069.

By contrast, ERISA's express preemption provision preempts "any and all State laws insofar as they . . . relate to any employee benefit plan," except for state laws "which regulate[] insurance, banking, or securities." 29 U.S.C. §§ 1144(a), (b)(2)(A). In one respect, ERISA's provision thus preempts a narrower subset of state laws, because it cannot preempt laws regulating insurance, banking, or securities. But in another respect, it preempts a broader range of state laws, because the state law need only "relate to" an ERISA plan. This is very different from requiring that the state law "relate[] to health insurance or plans," as needed in the FEHBA

context. This and the other differences identified above cast doubt on the notion that case law interpreting the two preemption provisions can be applied interchangeably.

An example helps illustrate the distinction between these two provisions. Consider, as the Supreme Court did in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724 (1985), a state law regulating coverage of mental health benefits. Specifically, consider a state law requiring any health benefit plan that provides hospital and surgical coverage to *also* provide coverage for certain mental health services, such as confinement in a mental hospital. *See id.* at 730. As the Supreme Court held in *Metropolitan Life Insurance*, this state law is *not* preempted by ERISA's express preemption provision. The state law clearly falls within the ambit of ERISA's broad preemption clause because it "relate[s] to" an employee benefit plan: it requires benefit plans to purchase mental health benefits in certain circumstances. *See id.* at 739. But the law is saved from preemption by the savings clause, which excepts from preemption any state law "which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). A state law requiring insurance coverage for mental health services obviously "regulates insurance," and is thus not preempted. *See Metropolitan Life Insurance*, 471 U.S. at 740-44.

But the same state law would be preempted by FEHBA's express preemption provision. A state law requiring coverage for certain mental health services clearly "relates to health insurance or plans." 5 U.S.C. § 8902(m)(1). And the terms of a FEHBA contract that specify the scope of mental health services that must be provided would also clearly "relate to the nature, provision or extent of coverage or benefits." *Id.* The state law requiring mental health services would thus be preempted by the terms of the FEHBA contract. Unlike in the ERISA context, there is no savings clause for state laws regulating insurance—to the contrary, it is precisely *because* the state law "relates to health insurance" that it is preempted by FEHBA's express preemption provision.

In addition to conflating the two preemption provisions, there is a second aspect of the *Cedars-Sinai* analysis that merits attention—the court in *Cedars-Sinai* uses a preemption framework that has since been overruled. To explain this point, a brief background on

preemption is necessary. There are two types of preemption in the FEHBA and ERISA contexts: conflict preemption and complete preemption. Conflict preemption is a defense that defendants can invoke against state law claims. To invoke the defense of conflict preemption, as NALC Health and Cigna have done here, defendants rely on the statutes' express preemption provisions discussed above. *See Marin General*, 581 F.3d at 945-46. As noted, these provisions direct that federal law or the terms of a contract entered into pursuant to federal law "supersede" certain state laws, preempting those state law causes of action. 5 U.S.C. § 8902(m)(1); 29 U.S.C. § 1144(a). But a defense of conflict preemption does not give federal courts subject matter jurisdiction over state law claims—if no other basis for federal jurisdiction exists, the claims must stay in state court and the defendants must raise the federal preemption defense there. *See Marin General*, 581 F.3d at 945.

Complete preemption, by contrast, is both a defense to state law claims and a jurisdictional issue. *See id.* When defendants face state law claims in state court, they can invoke complete preemption as a basis for removal to federal court, and the fact of complete preemption gives the federal court exclusive subject matter jurisdiction over the case.[2] *See id.* In the ERISA context, complete preemption often arises when plaintiffs bring claims under state law that necessarily depend on construing the terms of an ERISA plan. The claims—although nominally state law causes of action—are effectively disputes over the scope of an ERISA plan's coverage. For example, in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), two people enrolled in ERISA plans filed suit in Texas state court against their ERISA plan administrators bringing claims under the Texas Health Care Liability Act (THCLA). These people alleged that the plan administrators violated their duty under the THCLA to exercise ordinary care when making

[2] The part of the ERISA statute that has been interpreted as establishing complete preemption is 29 U.S.C. § 1132(a), which provides a civil right of action to a "participant or beneficiary" in an ERISA plan. *See Marin General*, 581 F.3d at 945. In the FEHBA context, arguments for complete preemption have been based on a combination of the express preemption provision at 5 U.S.C. § 8902(m)(1) and the provision at 5 U.S.C. § 8912, which states: "The district courts of the United States have original jurisdiction, concurrent with the United States Court of Federal Claims, of a civil action or claim against the United States founded on this chapter." *See, e.g.*, *Empire Healthchoice*, 547 U.S. at 689, 696-97; *Botsford*, 314 F.3d at 393-99.

health care treatment decisions by refusing to pay for certain health services. *See id.* at 205. The Supreme Court held that ERISA completely preempted the THCLA claims because the administrators' liability under the THCLA turned entirely on whether the ERISA benefit plans provided coverage for the services. *See id.* at 212-14. Although brought as a THCLA case, the suit was really a dispute over the scope of an ERISA plan's coverage, and thus needed to be in federal court. *See id.* at 214.

In this case, complete preemption is not an issue because the defendants only invoke the federal officer removal statute as a basis for subject matter jurisdiction. And it appears, on the surface at least, that complete preemption would not apply. The sole preemption question thus involves conflict preemption, and whether NALC Health and Cigna can successfully invoke it as a defense against California Spine's claims (to satisfy the "colorable federal defense" element of the federal officer removal statute).

There has been some confusion about the relationship between conflict and complete preemption. This confusion is due in part to numerous Ninth Circuit opinions incorrectly mingling the two. *See Marin General*, 581 F.3d at 945-46 (noting that cases have been guilty of this mistake). The *Cedars-Sinai* ruling is one such opinion. In *Cedars-Sinai*, the issue was whether FEHBA completely preempted certain state law claims, but the court incorporated conflict preemption into the analysis by making it the second step of a two-step complete preemption inquiry. *See* 497 F.3d at 975 (citing *Botsford*, 314 F.3d at 393). The court thus determined whether conflict preemption existed—by conducting the analysis of FEHBA's express preemption provision—even though the legal question was that of complete preemption. Subsequent Ninth Circuit case law, relying on Supreme Court authority, has clarified that this approach is incorrect: conflict preemption and complete preemption are two distinct inquiries, and conflict preemption is not part of the complete preemption analysis. *See Fossen v. Blue Cross & Blue Shield of Montana, Inc.*, 660 F.3d 1102, 1111-12 (9th Cir. 2011) (citing *Aetna*

*Health Inc. v. Davila*, 542 U.S. 200 (2004)); *Marin General*, 581 F.3d at 945-46 (same).[3] The conflict preemption analysis contained in the *Cedars-Sinai* opinion, which is the portion of the opinion that dictates the outcome here, thus never should have been conducted as part of the complete preemption question presented in that case.

These flaws aside, *Cedars-Sinai* clearly held that FEHBA's express preemption provision does not apply to claims brought by hospitals against FEHBA carriers for obligations specific to the hospital-carrier relationship. Even though there may be a colorable argument that the language of FEHBA's preemption provision is to the contrary, *Cedars-Sinai*'s holding compels the conclusion that NALC Health and Cigna do not have a colorable federal preemption defense against California Spine's quantum meruit claim.

**2. Sovereign Immunity**

NALC Health and Cigna do have a colorable defense of sovereign immunity against both the quantum meruit and promissory estoppel claims. Sovereign immunity applies if the United States is the "real party in interest," meaning that "recovery would come from the federal treasury." *Anderson v. Occidental Life Insurance Co. of California*, 727 F.2d 855, 856 (9th Cir. 1984) (per curium).

The evidence submitted by NALC Health strongly suggests that recovery in this case would come from the federal government. As discussed above, most of the funds that NALC Health uses to operate come from a letter of credit account owned by OPM in the United States Treasury. NALC Health draws upon this account to pay for its expenses. NALC Health's contract with OPM specifically authorizes it to charge this account for "benefit costs," which include "payments made and liabilities incurred for covered health care services." NALC Health can also charge the account for "administrative expenses," which "consist of all actual,

---

[3] Although *Fossen* and *Marin General* clarify that complete preemption does not include conflict preemption in the ERISA context, their holdings still abrogate the complete preemption framework used by the court in *Cedars-Sinai* in the FEHBA context. This is so because the court in *Cedars-Sinai* simply transplants the ERISA complete preemption test and applies it to FEHBA, such that the Ninth Circuit's abrogation of the test in the ERISA context applies equally to the use of that test in the FEHBA context.

allowable, allocable and reasonable expenses incurred in the adjudication of subscriber benefit claims or incurred in the Carrier's overall operation of the business." Chargeable administrative expenses include "legal expenses incurred in the litigation of benefit payments."

California Spine's claims stem from representations made by NALC Health's agent regarding the benefits coverage of a patient enrolled in the FEHBA plan. There is thus, at the very least, a colorable argument that the judgment in this case would be chargeable to the OPM account as either a "benefit cost" or an "administrative expense." NALC Health's administrator asserted as much in a declaration submitted in connection with this motion, based in part on his own "experience with what expenses OPM allows to be charged." The administrator further stated that the recovery would be chargeable to the federal account even if a judgment in favor of California Spine "implied that Cigna erred in responding to [California Spine's] inquiry" about coverage. This is so because the contract allows NALC Health to charge OPM for expenses incurred in error. Specifically, the contract permits NALC Health to charge the account for "benefit payments made erroneously but in good faith," along with "administrative costs to correct erroneous benefit payments (or to correct processes or procedures that caused erroneous benefit payments)," so long as NALC Health shows that it made a "prompt and diligent" effort to recover the erroneously paid benefits and that the error was not "egregious or repeated." Taken together, this is enough to establish a colorable defense of sovereign immunity. Whether the defendants ultimately prevail on that defense remains a question for another day.

California Spine's main argument against sovereign immunity is that the Ninth Circuit has held that state law claims for quantum meruit and promissory estoppel are not claims "for benefits" within the meaning of FEHBA. Thus, California Spine says, the funds to pay the recovery on these claims will not come from the federal treasury and sovereign immunity does not apply. California Spine is correct that the Ninth Circuit has distinguished between claims brought by a health care provider under FEHBA pursuant to a patient's assignment of rights, and, as here, claims brought by a health care provider under state law seeking damages in the provider's own right. The Ninth Circuit has held that the former are claims "for benefits" under

FEHBA, while the latter are not. *See Cedars-Sinai*, 497 F.3d at 976-980; *see also Marin General*, 581 F.3d at 947-951. But the question whether California Spine's claims are ones "for benefits" within the meaning of FEHBA is analytically distinct from (even if related to) the question whether a judgment in this case would come from the federal treasury. Put another way, the evidence produced by NALC Health suggests that OPM has authorized NALC Health to charge its federal treasury account for costs and expenses beyond those strictly used to satisfy "claims for benefits" under FEHBA.

**IV**

Because NALC Health and Cigna have satisfied the requirements of the federal officer removal statute, 28 U.S.C. § 1442(a), the Court has subject matter jurisdiction over California Spine's claims and its motion to remand is denied.

**IT IS SO ORDERED.**

Dated: July 12, 2021

VINCE CHHABRIA
United States District Judge